# NO. 12-12-00325-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN RE PARK CITIES BANK, THOMAS* | § | |
| *YOUNGBLOOD, MICHAEL MERRITT,* | | |
| *JOHN DIENES, STEVEN METZGER,* | | |
| *BRIAN NEITZEL, TODD ASHBROOK,* | § | *ORIGINAL PROCEEDING* |
| *MICHAEL SAKS, AND PCB SMITH* | | |
| *COUNTY PROPERTIES, LLC,* | | |
| *RELATORS* | § | |

## *OPINION*

This original mandamus proceeding arises out of a discovery dispute. The relators are Park Cities Bank, Thomas Youngblood, Michael Merritt, John Dienes, Steven Metzger, Brian Neitzel, Todd Ashbrook, Michael Saks, and PCB Smith County Properties, LLC. Lewie Anderton is the real party in interest. Relators challenge the trial court's September 12, 2012 order partially granting Anderton's motion to overrule Relators' claims of privilege and granting Anderton's motion to compel discovery responses. The respondent is the Honorable Randall Lee Rogers, Judge of the County Court at Law No. 2, Smith County, Texas. We conditionally grant the petition.

## BACKGROUND

In 2002, Lewie Anderton and William R. Cawley formed two partnerships in order to develop The Cascades, a golf and residential community, in Tyler, Texas. Cascade Properties, Ltd. (Cascade Ltd.) was to develop the residential portion, and Bellwood Lake Partnership, Ltd. (Bellwood) was to purchase and further develop a golf course adjoining The Cascades. In 2006, Anderton, as president of Bellwood's general partner, signed a $13,325,000 note to Park Cities Bank (the Bank). Anderton, Cawley, and the Bill Cawley 1997 Revocable Trust (the guarantors)

guaranteed the note. At the time, Cawley was a 10% shareholder and a director of the Bank. He was also a member of the Bank's loan committee.

The relationship between Anderton and Cawley became rocky over the years, and in May 2008, Anderton sued Cawley in a Dallas County district court. Tensions between the two continued to escalate. In February 2009, the Bank gave notice to Bellwood and the guarantors that Bellwood was in default on the $13,325,000 loan, in part because it had not paid the 2008 property taxes.

On June 30, the Bank, as authorized by the loan documents, paid Bellwood's delinquent property taxes of $114,456.46 to Smith County. Also on June 30, BOT Real Estate (BOT), a limited liability company formed by Cawley, paid the Bank $114,456.46. On July 1, the Bank made demand on Bellwood and the guarantors for reimbursement of the $114,456.46 delinquent property tax payment it had made the day before. No reimbursement was made, and the Bank subsequently sold the loan to BOT. BOT promptly began foreclosure proceedings against Bellwood on the golf course, which it then purchased at the foreclosure sale. BOT later took a deficiency judgment against Anderton. In 2011, Anderton filed suit in Smith County against Relators alleging, among other causes of action, common law and statutory fraud.

The chronology leading to the discovery dispute before this court developed as follows:

| | |
|---|---|
| October 11, 2011 | Anderton served Relators with sixty-five requests for production (RFPs) |
| November 9, 2011 | Relators filed a motion for a protective order, which included an alternative motion to obtain or compel search terms |
| November 14, 2011 | Relators' responses to Anderton's RFPs were due but not filed |
| February 21, 2012 | The trial court held a hearing on Relators' motion for protective order and denied it without ruling on their alternative motion |
| March 20, 2012 | Anderton filed a motion to compel production |
| March 22, 2012 | Relators filed consolidated objections and responses to Anderton's RFPs |
| May 8, 2012 | Park Cities Bank, John Dienes, and PCB Smith County Properties, LLC (Bank Relators) filed their first privilege log |
| May 30, 2012 | Bank Relators filed their first amended privilege log |

| June 1, 2012 | Anderton filed a motion to overrule Relators' claims of privilege |
| --- | --- |
| June 8, 2012 | Bank Relators filed their second amended privilege log |
| June 21, 2012 | Bank Relators filed their third amended privilege log |
| July 24 and 26, 2012 | The trial court held a hearing on Anderton's motion to overrule Relators' claims of privilege, his motion to compel discovery responses, and Relators' alternative motion to obtain or compel search terms |
| September 12, 2012 | The trial court signed the order that is the subject of this proceeding |

In pertinent part, the trial court's order provides as follows:

A.  As to the First Amended Privilege Log filed by Defendant Park Cities Bank, Defendant Dienes, and Defendant PCB Smith County Properties, LLC (the "Bank Parties");

   1.  The Court finds there was no anticipation of litigation by the Bank Parties except during the time periods February 15, 2010 to April 21, 2010 and August 31, 2011 to present;

   2.  All claims of privilege made by the Bank Parties on their First Amended Privilege Log are overruled except as to those claimed for documents generated during the time period February 15, 2010 to April 21, 2010 and during the time period August 31, 2011 to present.

   3.  The Bank Parties are ordered to produce each and every document listed on their First Amended Privilege Log within 10 days of this Order, excluding only those documents subject to claims of privilege found valid by this Court above in Paragraph A(2).

B.  As to the Third Amended Privilege Log filed by the Bank Parties;

   1.  The Court finds there was no anticipation of litigation by the Bank Parties except during the time periods February 15, 2010 to April 21, 2010 and August 31, 2011 to present;
   2.  All claims of privilege made by the Bank Parties on their Third Amended Privilege Log are overruled except as to those claimed for documents generated during the time period February 15, 2010 to April 21, 2010 and during the time period August 31, 2011 to present.
   3.  The Bank Parties are ordered to produce each and every document listed on their Third Amended Privilege Log within 30 days of this Order, excluding only those documents subject to claims of privilege found valid by this Court above in Paragraph B(2).

C.  Subject only to the claims of privilege found valid by this Court above in Paragraphs A(2) and B(2), Plaintiff's Motion to Overrule Defendants' Claims of Privilege is GRANTED.

D.  Subject only to the claims of privilege found valid by this Court above in Paragraphs A(2) and B(2), Plaintiff's Motion to Compel is GRANTED.

E.  Each Defendant is ordered to produce each and every document responsive to Plaintiff's Request for Production Nos. 1 through 65 within 30 days of this Order, excluding only those documents subject to

3

claims of privilege found valid by this Court above in Paragraphs A(2) and B(2) as asserted by the Bank Parties.

Relators filed this original proceeding contending the trial court abused its discretion by overruling the majority of its work product claims, its attorney-client privilege claims, and its objections to discovery. They also filed a motion for emergency relief. We granted the motion and stayed the proceedings in the trial court until further order of this court.

## PREREQUISITES TO MANDAMUS

Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law where there is no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex. 2004) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding).

Mandamus is proper when the trial court erroneously orders the disclosure of privileged information because the trial court's error cannot be corrected on appeal. *Walker*, 827 S.W.2d at 843; *see also In re Crestcare Nursing & Rehab. Ctr.*, 222 S.W.3d 68, 72 (Tex. App.–Tyler 2006, orig. proceeding [mandamus denied]) (mandamus available to protect confidential documents from discovery). Mandamus is also available when a trial court fails to conduct an in camera inspection of documents if the review is critical to its evaluation of a privilege claim. *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004); *In re Crestcare Nursing & Rehab. Ctr.*, 222 S.W.3d at 72. Moreover, mandamus relief is available when the trial court compels production beyond the permissible bounds of discovery. *In re Weekley Homes, L.P.*, 295 S.W.3d 309, 322 (Tex. 2009) (orig. proceeding).

## PRIVILEGES ASSERTED –APPLICABLE LAW

Our procedural rules define the general scope of discovery as any unprivileged information that is relevant to the subject matter of the action, even if it would be inadmissible at trial, as long as the information sought is "reasonably calculated to lead to the discovery of admissible evidence." TEX. R. CIV. P. 192.3(a); *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003). Relators asserted primarily the work product and attorney-client privileges in response to Anderton's RFP's.

4

## Work Product Privilege

The definition of "work product" and the extent to which work product is protected are set out in Texas Rule of Civil Procedure 192.5.

> (a) *Work Product Defined.* Work product comprises:
>
> (1) material prepared or mental impressions developed in anticipation of litigation or for trial by or for a party or a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents; or
> (2) a communication made in anticipation of litigation or for trial between a party and the party's representatives or among a party's representatives, including the party's attorneys, consultants, sureties, indemnitors, insurers, employees, or agents.
>
> (b) *Protection of Work Product*.
>
> (1) *Protection of core work product-attorney mental processes.* Core work product–the work product of an attorney or an attorney's representative that contains the attorney's or the attorney's representative's mental impressions, opinions, conclusions, or legal theories–is not discoverable.
> (2) *Protection of other work product.* Any other work product is discoverable only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the material by other means.
> (3) *Incidental disclosure of attorney mental processes.* It is not a violation of subparagraph (1) if disclosure ordered pursuant to subparagraph (2) incidentally discloses by inference attorney mental processes otherwise protected under subparagraph (1).
> (4) *Limiting disclosure of mental processes.* If a court orders discovery of work product pursuant to subparagraph (2), the court must–insofar as possible–protect against disclosure of the mental impressions, opinions, conclusions, or legal theories not otherwise discoverable.

TEX. R. CIV. P. 192.5(a), (b). Under this rule, the work product privilege is broader than the attorney-client privilege because it includes all communications made in preparation for trial, including an attorney's interviews with parties and nonparty witnesses. *In re Bexar Cnty. Criminal Dist. Attorney's Office*, 224 S.W.3d 182, 186 (Tex. 2007). It covers more than just documents, extending to an attorney's mental impressions, opinion, conclusions, and legal theories. *Id*. It also includes the selection and ordering of documents. *Id*.

To determine if the work product privilege applies, a trial court must look to the totality of the circumstances in each case where it has been asserted. *See In re Toyota Motor Corp.*, 94 S.W.3d 819, 823 (Tex. App.–San Antonio 2002, orig. proceeding). From those circumstances, the trial court must determine whether a reasonable person in the party's position would have

anticipated litigation and whether the party actually did anticipate litigation.  *In re Monsanto Co.*, 998 S.W.2d 917, 923-24 (Tex. App.–Waco 1999, orig. proceeding). The first prong requires an objective examination of the facts with consideration being given to outward manifestations that indicate litigation is imminent.  *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 40-41 (Tex. 1989).  The second prong utilizes a subjective approach by asking if the party opposing discovery had a good faith belief that litigation would ensue.  *Id*.

A party may reasonably anticipate suit being filed and prepare for the expected litigation before anyone manifests an intent to sue.  *Nat'l Tank Co. v. Brotherton*, 851 S.W.2d 193, 204 (Tex. 1993).  Actual notice of a potential lawsuit is not required for a party to anticipate litigation.  *See Trevino v. Ortega*, 969 S.W.2d 950, 957 (Tex. 1998) (noting that in *National Tank*, the court did not require actual notice of potential litigation for a party to anticipate litigation).

## Attorney-Client Privilege

The scope of the attorney-client privilege is defined in Texas Rule of Evidence 503.  The following rules of the privilege are applicable in this case:

> **(b)  Rules of Privilege.**
>
> (1)  *General rule of privilege*.  A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:
>
> (A)  between the client or a representative of the client and the client's lawyer or a representative of the lawyer;
> (B)  between the lawyer and the lawyer's representative;
> (C)  by the client or a representative of the client, or the client's lawyer or a representative of the lawyer, to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein;
> (D)  between representatives of the client or between the client and a representative of the client; or
> (E)  among lawyers and their representatives representing the same client.

TEX. R. EVID. 503(b)(1).

This privilege attaches to the complete communication between attorney and client.  *In re Small*, 346 S.W.3d 657, 663 (Tex. App.–El Paso 2009, orig. proceeding).  The subject matter of the information communicated is irrelevant when determining whether the privilege applies.  *Id*. The privilege attaches to legal advice and factual information included in completed communications between attorney and client.  *Id*.  A communication is "confidential" if it is not

6

intended to be disclosed to third persons other than those to whom disclosure is made "in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." TEX. R. EVID. 503(a)(5).

**Asserting and Establishing Privilege**

A party may assert a privilege by withholding documents and stating in its response to a discovery request (1) that information or material responsive to the request has been withheld, (2) the request to which the information or material relates, and (3) the privilege or privileges asserted. TEX. R. CIV. P. 193.3(a). Upon request, the withholding party must serve a privilege log describing the withheld materials, without revealing privileged information, and asserting a specific privilege for each withheld item. TEX. R. CIV. P. 193.3(b). The burden is on the party asserting a privilege from discovery to produce evidence concerning the applicability of the privilege. *Peeples v. Fourth Court of Appeals*, 701 S.W.2d 635, 635 (Tex. 1985).

The mere listing of a specific privilege in a response or a privilege log does not prove that privilege. *In re Monsanto Co.*, 998 S.W.2d at 928. Therefore, in addition to the privilege log, the party resisting discovery must establish a prima facie case for the privilege by testimony or affidavit. *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 261 (Tex. 2005). The prima facie standard requires only the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true. *In re E.I. DuPont de Nemours & Co*., 136 S.W.3d at 223; *In re Crestcare Nursing & Rehab. Ctr.*, 222 S.W.3d at 73. "[A]n affidavit, even if it addresses groups of documents rather than each document individually, has been held to be sufficient to make a prima facie showing of attorney-client and/or work product privilege." *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 223. In some instances, the documents themselves may constitute the only evidence substantiating the claim of privilege. *Weisel Enterprises, Inc. v. Curry*, 718 S.W.2d 56, 58 (Tex. 1986); *In re BP Prods. N. Am. Inc*., 263 S.W.3d 106, 115 (Tex. App.–Houston [1st Dist.] 2006, orig. proceeding). Once the party resisting discovery establishes a prima facie case that the documents are privileged, the burden shifts to the discovering party to refute the privilege claim. *In re Small*, 346 S.W.3d at 662-63.

If the trial court determines that an in camera review of some or all of the requested discovery is necessary, that material or information must be segregated and produced to the court in a sealed wrapper within a reasonable time following the hearing. TEX. R. CIV. P. 193.4(a). The trial court abuses its discretion in failing to conduct an in camera inspection when such

review is critical to the evaluation of a privilege claim. ***In re Living Ctrs. of Tex., Inc.***, 175 S.W.3d at 261.

## Crime-Fraud Exception

Rule 503 specifies certain exceptions to the attorney-client privilege, including the following:

> **(d) Exceptions**. There is no privilege under this rule:
>
> (1) *Furtherance of crime or fraud.* If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud[.]

TEX. R. EVID. 503(d)(1). The crime-fraud exception also applies to any work product created under circumstances within this exception. TEX. R. CIV. P. 192.5(c)(5). The party seeking discovery of an otherwise privileged communication bears the burden of proving the exception. ***In re USA Waste Mgmt. Res., L.L.C.***, 387 S.W.3d 92, 98 (Tex. App.–Houston [14th Dist.] 2012, orig. proceeding [mandamus denied]).

The crime-fraud exception applies only if (1) the party asserting the exception makes a prima facie showing that a crime or fraud was ongoing or about to be committed, and (2) there is a relationship between the document for which the privilege is challenged and the prima facie proof offered. ***Granada Corp. v. First Court of Appeals***, 844 S.W.2d 223, 227 (Tex. 1992); ***In re Gen. Agents Ins. Co. of Am.***, 224 S.W.3d 806, 819 (Tex. App.–Houston [14th Dist.] 2007, orig. proceeding). The prima facie requirement is met when the proponent offers evidence establishing the elements of fraud and that the fraud was ongoing, or about to be committed, at the time the document was prepared. ***In re Small***, 346 S.W.3d at 666. The fraud alleged to have occurred must have happened at or during the time the document was prepared, and the document must have been created as part of perpetrating the fraud. ***Id***.

In addition to the prima facie showing, the party asserting the crime-fraud exception must show that a nexus exists between the privileged documents and the alleged fraud. ***Granada Corp.***, 844 S.W.2d at 227; ***In re Seigel***, 198 S.W.3d 21, 28 (Tex. App.–El Paso 2006, orig. proceeding [mandamus denied]). This nexus must be established for each privileged document. ***In re Seigel***, 198 S.W.3d at 28. Mere allegations of a connection between the alleged fraud and the document will not suffice. ***In re Small***, 346 at 667.

In their fourth issue, Relators contend the trial court abused its discretion in finding that there was no anticipation of litigation prior to February 15, 2010, and between April 22, 2010, and August 30, 2011. In their fifth issue, Relators contend the trial court abused its discretion by failing to conduct an in camera inspection of the documents listed in their third amended privilege log before ordering them to produce the documents.[1] We will consider these two issues together.

## Waiver

Before proceeding to the merits, however, we note that Anderton contends Relators waived their privilege claims by failing to object to Anderton's RFPs within thirty days. Relators respond that they did not need to assert a privilege claim at that time. We agree with Relators. No objection needs to be made to preserve a privilege, and the rules set no time limit for asserting a privilege. *See* TEX. R. CIV. P. 193.2(f), 193.3; *In re Graco Children's Prods., Inc*., 173 S.W.3d 600, 605 (Tex. App.–Corpus Christi–2005, orig. proceeding). There was no waiver of Relators' privilege claims.

## Work Product Privilege

The time periods for which the trial court found the work product privilege "valid" correspond to the time the Bank was a party to the Dallas County suit (February 15, 2010, to April 21, 2010) and the time during which the Smith County suit has been pending (August 31, 2011 "to present"). Therefore, the trial court implicitly determined that the work product privilege applied only if there was actual ongoing litigation between Anderton and any of the relators. This definition is too narrow. *See Nat'l Tank Co.*, 851 S.W.2d at 204; *Trevino*, 969 S.W.2d at 957. To determine the applicability of the work product privilege, the trial court must consider the totality of the circumstances and determine whether a reasonable person in Relators'

---

[1] In its order, the trial court refers to Relators' first amended and third amended privilege logs. However, Relators' first amended privilege log was superseded by a subsequent amendment. Relators state in their mandamus petition that "the first 530 entries on the Third Amended Privilege Log correspond to the very same documents as the 530 entries in the First Amended Privilege Log." Accordingly, we refer only to the third amended privilege log in our analysis.

position would have anticipated litigation and whether they actually did anticipate litigation.[2] *See In re Monsanto Co.*, 998 S.W.2d at 923-24.

1. **Relators' Evidence.** Relators presented the affidavit of Wally Reed, an executive vice-president and credit officer of the Bank, who identified two outside law firms that represented the Bank during the period covered by Relators' work product assertions. According to Reed's affidavit, the law firm of Metzger & McDonald PLLC represented the Bank regarding, among other things, (1) the loan to Bellwood and related agreements, (2) the BOT and COT Real Estate, LLC[3] loans and related agreements, and (3) Anderton's Dallas County lawsuit, including but not limited to responding to document subpoenas and presenting employees or directors of the Bank for depositions, representing the Bank while it was a party to the case, and monitoring the case after the Bank was dismissed as a party. Reed also stated that the law firm of Kane Russell Coleman & Logan PC (KRCL) represented the Bank regarding, among other things, (1) the BOT and COT loans and related agreements, (2) monitoring Anderton's Dallas County lawsuit and bankruptcy proceeding, and (3) acting as co-counsel for the Bank in the Smith County suit.

Relators also presented the affidavits of Steven C. Metzger, a member of Metzger & McDonald, who has represented the Bank since 2002, and Boyd A. Mouse, a director of KRCL, who has represented the Bank since 2009.

Metzger stated that he had reviewed the documents described in item numbers 1 through 54, 490 through 513, and 531 through 637 of the privilege log. He also identified the various senders and recipients of the documents as representatives of Metzger & McDonald who were assisting in the performance of professional legal services for the Bank, or persons employed by the Bank "and/or were representatives of the Bank," and explained why they were entitled to receive confidential communications. He also stated that he was familiar with the definition of "work product" included in Rule 192.5. Finally, Metzger expressed his opinion that, applying this definition of "work product," the documents corresponding to the item numbers of the privilege log referred to in his affidavit are "material prepared or mental impressions developed in anticipation of litigation or for trial by or for [the Bank] or its representatives, or a

---

[2] Anderton's suit against the Bank in Dallas County was dismissed without prejudice to refiling. This is certainly some indication that there was "anticipation of litigation" by the Bank other than on the actual dates that a lawsuit was pending.

[3] This entity acquired the Cascade Properties real estate.

10

communication made in anticipation of litigation or for trial between [the Bank] and its representatives or among its representatives."

Mouse's affidavit was in the same form as Metzger's and contained similar information pertaining to the documents corresponding to item numbers 55 through 437 of the privilege log. He identified certain senders and recipients of the documents and explained their relationship to KRCL, the Bank, or other entities and explained why they were entitled to receive privileged communications. He also stated that he was familiar with the definition of "work product" included in Rule 192.5. In his opinion, Mouse stated further, the documents corresponding to the item numbers referred to in his affidavit are "material prepared or mental impressions developed in anticipation of litigation or for trial by or for [the Bank] or its representatives, or a communication made in anticipation of litigation or for trial between [the Bank] and its representatives or among its representatives."

We conclude that through the affidavits of Reed, Metzger, and Mouse, Relators established a prima facie case that the documents specifically mentioned in the affidavits were protected from discovery by the work product privilege. *See In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 224-25. Consequently, the burden shifted to Anderton to refute Relators' assertions of work product privilege. *See In re Small*, 346 S.W.3d at 667.

**2. Anderton's Evidence.** Anderton contends that the crime-fraud exception applies here. The record shows that on February 20, 2009, the Bank notified Bellwood and the guarantors that Bellwood was in default on its $13,325,000 loan, in part for failing to pay its 2008 property taxes. An internal Bank memorandum dated March 24, 2009, shows that the Bellwood loan was on a "watch list," that real estate taxes were due, and that Cawley was planning to form a new entity that would acquire the loan. The memorandum also refers to the continuing litigation between Anderton and Cawley. Other notations show that the Bank did not expect any "impairment" at that time, but categorized the loan as a Grade 6 due to "the uncertainty of the sale/replacement of collateral." Also on March 24, 2009, the Bank sent Bellwood and the guarantors another letter notifying them that the note was still past due. In this letter, the Bank cautioned that "[t]his normally is cause for concern in any of our business loans but in this case, even more so because of the continuing litigation between the partners and that no response to our demand for payment dated February 20, 2009 . . . has been received." The letter also included notice that foreclosure proceedings would be initiated if the loan was not

11

brought current by 3:00 p.m. on Tuesday, March 31, 2009. Although the loan was not brought current by the specified date and time, the Bank did not initiate foreclosure proceedings.

On June 30, 2009, the Bank paid Bellwood's delinquent 2008 property taxes ($114, 456.46). On that same day, BOT, a new entity formed by Cawley, issued a check for $114,456.46, payable to the Bank. The check stub reflects that $114,456.46 is the sum of six different line items for different amounts, all identified as "D8PropTaxBLP." The following day, the Bank demanded reimbursement from Bellwood and the guarantors for the amount of the taxes. The Bank did not receive the requested reimbursement. BOT subsequently completed its purchase of the Bellwood loan, foreclosed on the golf course, and took a default judgment against Anderton.

Anderton does not dispute that the loan was in default. Instead, his argument is that BOT's check for $114,456.46 "cured" Bellwood's default for failure to pay the 2008 property taxes. He argues that the Bank's failure to disclose the payment, along with its "fraudulent demand" for reimbursement and its transfer of the loan to BOT, showed the Bank's participation in a fraudulent scheme that allowed Cawley to take control of Bellwood. This, Anderton maintains, provided the Bank "with significant additional collateral to which it would not have otherwise had any right."

Underlying Anderton's fraud allegation is the assumption that Bellwood was entitled to credit for BOT's payment to the Bank. We initially note that Anderton cites no authority supporting this assumption. Secondly, when a third party pays the holder of a note, the transaction is presumed to be a purchase and not a payment and discharge of the note unless evidence shows the parties to the payment intended otherwise. *Anderton v. Cawley*, 378 S.W.3d 38, 49 (Tex. App.–Dallas 2012, no pet.). Anderton presented no such evidence.

Anderton first called Steven Metzger, one of the relators and also the attorney who represented the Bank in the sale of the Bellwood loan to BOT. As part of his representation, Metzger prepared the documents related to the sale. He also sent the July 1, 2009 letter on behalf of the Bank demanding reimbursement from Bellwood and the guarantors for the property taxes paid by the Bank. Metzger testified that the amount of the delinquent taxes paid by the Bank ($114,456.46) was advanced by the Bank and added to the Bellwood note as authorized by the lender's expenditures clause in the deed of trust. He also related that when he prepared the initial drafts of the documents for the sale of the Bellwood loan, he understood the loan would be sold

12

at "par." He explained that this meant it would be sold for the principal amount of the loan plus accrued interest through the date of sale. He also understood that the Bank would receive a cash payment and a promissory note secured by the balance of the assets sold and some additional collateral. Metzger consistently maintained that he knew nothing about the BOT check to the Bank until he read the opinion of the Dallas court of appeals in Anderton's Dallas County case. The record shows that this opinion was dated May 8, 2012.

On cross examination, Metzger again explained the lender's expenditures clause in the deed of trust, which authorized the Bank to pay the delinquent property taxes and add the amount to the note. He testified that under the terms of the deed of trust, Bellwood made a covenant to pay the taxes as they became due. If they did not, the Bank could pay them. When the sale of the note had not closed by June 30, the Bank decided to pay the taxes. At that point, the documents for the sale had to be revised because the purchase price to be paid by BOT also included any advances added back to the note. Metzger testified that the Bank included the $114,456.46 payment for property taxes as part of what was owed on the note. According to Metzger, the transaction between the Bank and BOT was simply a sale of the loan. He stated further that he did not know that BOT, by its check to the Bank, was doing anything but paying on its obligation to purchase the loan.

Anderton also called Michael Saks, another relator and the attorney for Cawley and his related entities. Saks represented BOT in the purchase of the Bellwood loan from the Bank. He testified that he had no knowledge of any collusion between Cawley or his entities and the Bank in connection with the BOT transaction. He also testified that to his knowledge on July 1, 2009 (the date the Bank's demand for reimbursement was sent), the Bank had paid Bellwood's delinquent property taxes and had not been reimbursed by anyone. Saks also testified that when he learned of the check from BOT, it was his understanding that it was tendered as consideration for the purchase of the Bellwood loan.

Nothing in the testimony of Metzger or Saks, which was uncontroverted, showed that the $114,456.46 check from BOT was intended as reimbursement for the property taxes paid by the Bank or that the payment was intended to cure Bellwood's default. Consequently, Anderton failed to rebut the presumption of purchase and therefore could not show that Bellwood was entitled to credit for BOT's payment. This undercut his fraud allegation and prevented him from establishing a prima facie case of fraud by the Bank. *See **In re Small***, 346 S.W.3d at 666.

13

Moreover, Anderton did not show a nexus between the alleged fraud and any of the documents ordered to be produced. *Id*. Therefore, Anderton did not establish that the crime-fraud exception applied. Nor did he request that the trial court review specific documents in camera to determine whether the documents were in fact privileged. *See **In re Monsanto Co.***, 998 S.W.2d at 925 (noting that party requesting discovery has burden to point out which specific document or groups of documents it believes require in camera inspection by the trial court). Accordingly, we hold that the trial court abused its discretion by ordering the production of the documents identified in the affidavits as work product "without at least subjecting them to an in camera review." *See **In re E.I. DuPont de Nemours & Co.***, 136 S.W.3d at 225; ***In re BP Prods. N. Am. Inc.,*** 263 S.W.3d at 115.

## Attorney-Client Privilege

We reach the same conclusion concerning Relators' attorney-client privilege assertions.

**1. Relators' Evidence.** Reed, Metzger, and Mouse addressed attorney-client privilege in their affidavits. Reed stated that he had reviewed the documents corresponding to privilege log item numbers 438-489 and 514-530. He described the representation provided to the Bank by Metzger & McDonald and by KRCL. He also identified various senders and recipients for the documents he reviewed and explained the relationship that entitled them to receive privileged communications. Reed stated further that he is familiar with the definitions of client, representative of a client, lawyer, representative of a lawyer, and confidential in Texas Rule of Evidence 503. After applying these definitions to the documents he reviewed, Reed concluded that the documents corresponding to item numbers 439-489 and 514-530 are confidential communications made for the purpose of facilitating the rendition of professional legal services to the Bank.

Metzger's affidavit provided the same types of information for the documents corresponding to privilege log item numbers 1-54, 490-513, and 531-637. He expressed his opinion, based on his familiarity with the applicable definitions in Texas Rule of Evidence 503, that these communications were made for the purpose of facilitating the rendition of professional legal services to the Bank. Mouse provided similar information and reached the same conclusion for the documents corresponding to item numbers 55-437 of the privilege log.

We conclude that through the affidavits of Reed, Metzger, and Mouse, Relators established a prima facie case that the documents identified in the affidavits were protected from

discovery by the attorney-client privilege. *See In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 224-25. Anderton then had the burden to refute Relators' assertion of attorney-client privilege. *See In re Small*, 346 S.W.3d at 667.

2. **Anderton's Evidence.** As we stated above, Anderton did not make a prima facie showing of the crime-fraud exception. Nor did he request that the trial court review specific documents in camera to determine whether the documents were in fact privileged. *See In re Monsanto Co.*, 998 S.W.2d at 925. Accordingly, we hold that the trial court abused its discretion by ordering the production of the referenced documents "without at least subjecting them to an in camera review." *See In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 225; *In re BP Prods. N. Am. Inc.*, 263 S.W.3d at 115.

## Common Interest Rule and Waiver

Confidential communications to which the attorney-client privilege applies include those "by the client or a representative of the client, or the client's lawyer or a representative of the lawyer, to a lawyer or a representative of a lawyer representing another party to a pending action and concerning a matter of common interest therein[.]" TEX. R. EVID. 503(b)(1)(C). This rule, often referred to as the "common interest" privilege, is an exception to the general rule that no attorney-client privilege attaches to communications that are made in the presence of or disclosed to a third party. *In re JDN Real Estate–McKinney L.P.*, 211 S.W.3d 907, 922-23 (Tex. App.–Dallas 2006, orig. proceeding [mandamus denied]); *In re Siegel*, 198 S.W.3d at 27.

The Texas Supreme Court has recently addressed the "pending action" requirement of the rule and concluded that the "common interest" privilege is more accurately described as an "allied litigant" privilege. *In re XL Specialty Ins. Co.*, 373 S.W.3d 46, 52 (Tex. 2012) (orig. proceeding). This is because the privilege does not extend beyond litigation and it applies to any parties–not just the defendants–to a pending action. *Id*. "Because of the pending action requirement, no commonality of interest exists absent actual litigation." *Id*.

Here, the Bank was a party to Anderton's Dallas County suit from February 15, 2010 to April 21, 2010. Relators have been parties to the pending Smith County suit since it was filed on August 31, 2011. In their affidavits, Reed, Metzger, and Mouse identify various senders and recipients for documents that they assert are protected from discovery by the "Attorney-Client (Common Interest)" privilege. In their mandamus petition, they call our attention to thirty-four items in Bank Relators' third amended privilege log to which they contend the common interest

rule applies. We have reviewed these entries and noted that only six of them are within the relevant time periods. Therefore, as to item numbers 38-40; 141; 227; 244-245; 249; 275; 277; 438; 460-61; 479; 549; 554-556; 558; 592-593; 613-614; 617-618; and 632-634, the trial court did not abuse its discretion in overruling Relators' common interest privilege claims without reviewing the corresponding documents in camera.

The remaining communications, identified as item numbers 410, 532, 535, 543, 546, and 547, occurred during the relevant time periods. In their affidavits, Reed, Metzger, and Mouse identified various senders and recipients, and explained their respective relationships that entitled them to receive privileged communications. Each affiant stated further that

> [a]t the time of these documents, the status and outcome of the First Anderton Lawsuit was and remains a matter of common interest among [the Bank] and the Cawley Parties. Some of the real property located in the Cascades that secures the BOT Loan is subject to the lis pendens filed by Anderton in connection with the First Anderton Lawsuit, which lis pendens predates [the Bank's] deed of trust regarding the BOT Loan. Anderton also attempted (unsuccessfully) to add [the Bank] as a defendant in the First Anderton Lawsuit. Thus, [the Bank] and the Cawley Parties or their lawyers have had communications dealing with their common interest in the outcome of the First Anderton lawsuit, the Anderton bankruptcy proceeding, and now of course the Second Anderton Lawsuit.

Therefore, they assert that the communications between those senders and recipients and designated in the privilege log as protected by the common interest privilege are not discoverable.

We first note that the affiants interpret "common interest" too broadly because they did not apply the "pending action" requirement of Rule 503. *See* TEX. R. EVID. 503(b)(1)(C). After applying that requirement, we conclude that the common interest privilege does not apply to the documents corresponding to item number 410 in the privilege log.

Michael Saks, with the law firm of Wright Ginsberg Brusilow P.C., and Gordon Russell with KRCL are the initial senders of the documents corresponding to item number 410. According to Mouse's affidavit, Saks represented the Cawley entities in various transactions and in the Anderton bankruptcy. Russell's firm represents the Bank in the Smith County suit. The recipients are Russell; Mouse (also a KRCL lawyer); Jeri Walker, a KRCL paralegal; and two Bank employees or representatives. The documents are described in the privilege log as "E-mail string re: BOT legal fee invoices from Wright Ginsberg Brusilow PC, with attachments." The Smith County suit was pending on the date of these documents, but neither Cawley nor any of

16

the Cawley entities are parties to that suit. And Saks is a party to the Smith County action, but the information included in the privilege log does not indicate that the documents pertain to that action. Accordingly, the trial court did not abuse its discretion in denying Relators' claim of common interest privilege for these documents.

The affidavits of Reed, Metzger, and Mouse, when read together, show that the documents corresponding to the remaining item numbers were sent and received by those authorized to receive confidential communications and fall within the parameters of Texas Rule of Evidence 503(a)(1)(C). Therefore, Relators made the required prima facie showing that these documents (item numbers 532, 535, 543, 546, and 547 in the privilege log) were subject to the common interest privilege.

Anderton points out that six of the relators (Youngblood, Merritt, Metzger, Neitzel, Ashbrook, and Saks) did not file a privilege log. Therefore, he urges, they have waived "any claims of privilege . . . in their entirety." Because of that waiver, his argument continues, Relators cannot assert the common interest privilege for documents that were shared with these relators. We first note that the six relators are either employees or representatives of the Bank or attorneys. There is nothing in the record before us to indicate that they had any documents in their possession responsive to Anderton's RFPs. Moreover, Anderton cites no authority supporting the proposition that Relators cannot assert the common interest privilege for documents shared with these six relators. Therefore, he has not shown that Relators cannot assert the "common interest" privilege for item numbers 532, 535, 543, 546, and 547.

### WAIVER OF OTHER OBJECTIONS TO DISCOVERY

Anderton contends that Relators waived their objections to his sixty-five RFPs because they failed to file specific written objections on or before November 14, 2011. As we stated previously, no objection is necessary to assert a privilege. *See* TEX. R. CIV. P. 193.2(f). Therefore, Relators did not waive any privilege claims by failing to object to Anderton's discovery on that basis before the response date. Relators contend, however, that none of their other objections were waived because they filed a motion for a protective order.

### Applicable Law

Texas Rule of Civil Procedure 193 governs responses and objections to written discovery. This rule was adopted in an effort to "streamline procedures, reduce costs, and

enhance the effectiveness of written discovery as a means of uncovering truth." Nathan L. Hecht & Robert H. Pemberton, *A Guide to the 1999 Texas Discovery Rules Revisions*, Nov. 11, 1998, F, http://www.supreme.courts.state.tx.us/rules/tdr/disccle3.htm.  To that end, Rule 193 imposes a duty upon parties to make a complete response to written discovery based upon all information reasonably available, subject to objections and privileges.  TEX. R. CIV. P. 193 cmt.1.

A party may object to written discovery only if a good faith legal and factual basis for the objection exists at the time the objection is made.  TEX. R. CIV. P. 193.2(c).   In general, the rules require the responding party to serve a written response, including any objections to written discovery, within thirty days after service of a request for production.  *See* TEX. R. CIV. P. 193.2(a), 196.2(a).  If party objects to part but not all of a production request, the party must comply with the part to which it did not object.  TEX. R. CIV. P. 192.3(b).  An objection that is not made within the time required is waived unless the court excuses the waiver for good cause shown.  TEX. R. CIV. P. 193.2(e).  But an objection may be amended or supplemented to state an objection that was inapplicable or unknown after reasonable inquiry when the original objection was made.  TEX. R. CIV. P. 193.2(d).

An objection to written discovery must be in writing and must state specifically the legal or factual basis for the objection.  TEX. R. CIV. P. 193.2(a).  Thus, a responding party who objects to a request for production because is it overbroad, unduly burdensome, vague, ambiguous, or unreasonably cumulative or duplicative should explain why the discovery request suffers from each asserted deficiency.  *See id*.; *see also* Robert K. Wise, *Ending Evasive Responses to Written Discovery: A Guide for Properly Responding (and Objecting) to Interrogatories and Document Requests Under the Texas Discovery Rules*, 65 BAYLOR L. REV. 510, 563 (Spring 2013); *but see* **Reynolds v. Murphy**, 188 S.W.3d 252, 260 (Tex. App.–Fort Worth 2006, pet. denied) (holding more specific objection unnecessary where party's objection to large set of requests for admissions was that volume was unduly burdensome and harassing).   The responding party must also state the extent to which the party is refusing to comply with the request.  TEX. R. CIV. P. 193.2(a).

Under the former discovery rules, objections and privilege claims not asserted within the time for responding were waived.  Hecht & Pemberton, *supra*, at F-3.  To avoid waiver, parties frequently, out of an abundance of caution, asserted voluminous prophylactic general objections

that often proved unnecessary.  *Id*.  This defeated the purpose of discovery and caused unnecessary expense.  *Id*.

A primary goal of all of the groups considering discovery reform in anticipation of revising the former discovery rules was to rid the system of prophylactic objections.  47 Alex Wilson Albright et al., *Texas Practice Series: Handbook on Texas Discovery Practice* § 7:3 (2012 ed.).  As a result, Rule 193 requires a good faith legal and factual basis at the time the objection is made.  *See* Tex. R. Civ. P. 193.2(c).  Additionally, an objection that is obscured by numerous unfounded objections is waived unless the court excuses the waiver for good cause shown.  Tex. R. Civ. P. 193.2(e).  These two provisions eliminate the perceived need for, and the practice of making, prophylactic objections to prevent a waiver of discovery objections.  S*ee* Wise*, supra*, at 562 ("These provisions' obvious purpose is to eliminate the practice of interposing numerous hypothetical or prophylactic objections to . . . prevent a waiver of objections."); *see also* Hecht & Pemberton, *supra*, at F-3.

A party from whom discovery is sought may move for a protective order within the time for the response.  Tex. R. Civ. P. 192.6(a).  But the movant must comply with the discovery request to the extent protection is not sought unless it is unreasonable under the circumstances to do so before obtaining a ruling on the motion.  *Id*.

## Discussion

Relators sought protection from discovery because they planned to file a motion for summary judgment asserting the affirmative defense of res judicata.  They informed the trial court that this soon-to-be-filed motion would include all of Anderton's claims in the Smith County suit.  And they argued that staying discovery until the trial court ruled on the motion would prevent them from having to respond to burdensome, expensive, and time-consuming discovery that would be irrelevant if their summary judgment motion was granted.  Relators also asserted that Anderton's RFPs

> are overly broad, unduly burdensome, harassing, seek documents that are not relevant nor reasonably calculated to lead to the discovery of admissible evidence, constitute an impermissible fishing expedition, require [Relators] to marshal their evidence, invade [Relators'] right to privacy as guaranteed by the United States Constitution and Texas Constitution, seek documents that are confidential, proprietary, and trade secrets, seek documents that are privileged attorney-client communications and attorney work product, among other things.

19

In addition to these general objections, Relators purported to "reserve the right to assert specific objections to each request for production should the Court deny this motion and require [Relators] to substantively respond to [Anderton's] discovery requests."  Anderton alleged in his motion to compel that Relators had waived their objections because they did not timely assert specific objections to each RFP by the response date and never sought an extension of the deadline for responding.  Relying on Rule 192.6(a), Relators assert that filing a motion for protective order did not waive their objections.

Rule 192.6(a) provides, in part, that "[a] person should not move for protection when an objection to written discovery . . . is appropriate, but a motion does not waive the objection. . . ." This portion of the rule has two purposes.  *See* Hecht & Pemberton, *supra*, at E-5.  First, it clarifies that persons should not move for a protective order when an objection is appropriate. *Id*.  Second, it attempts to avoid creating a "trap" for the unwary or "breeding satellite litigation" regarding whether a protective order or an objection was the appropriate vehicle for seeking relief from discovery.  *Id.*

Relators' argument suggests that filing a motion for a protective order provides an exception to the rule that "[a]n objection that is not made within the time required . . . is waived unless the court excuses the waiver for good cause shown."  TEX. R. CIV. P. 193.2(e).  However, nothing in the language of either rule persuades us that this is the correct interpretation. Moreover, Relators have not directed us to any authority supporting this interpretation, nor have we been able to locate any such authority.  Indeed, the express language of the rule is that "the objection" is not waived.  We interpret "the objection" to mean the complaint that was asserted by a motion for protection when an objection was appropriate.   *See* TEX. R. APP. P. 192.6(a). This reading is consistent with the plain language of the rule and does not limit the application of Rule 193.2(e).  *See **In re Christus Spohn Hosp. Kleberg***, 222 S.W.3d 434, 437 (Tex. 2007) (stating that clear and unambiguous rule of procedure should be construed according to its plain or literal meaning).  Rule 192.6(a) does not aid Relators.

Next, Relators contend that their objections are not waived because they filed general objections and reserved the right to assert specific objections if the trial court denied their motion for protective order and required them to respond to Anderton's RFPs.  However, prophylactic objections are now prohibited by the rules of procedure. *See* TEX. R. CIV. P.  193.2(c), (e); *see also* Wise, *supra*, at 568 (stating that prophylactic or general objections violate Rules 193.2(a)

and (e), among others; trial court should strike, ruling that each such objection has been waived). And the rules make no provision for a party to avoid responding to written discovery within thirty days merely by reserving the right to respond later.

The discovery rules specify the content of objections to written discovery, the time for making those objections, and the penalty for failing to do so. *See* TEX. R. CIV. P. 193.2(a), (c), (e). Prophylactic general objections and a reservation to file later specific objections are not permitted under Rule 193. *See id*. Thus, a determination that prophylactic general objections satisfy Rule 193 would be contrary to the rule's plain language and would reinstate the practice of filing prophylactic general objections to avoid waiver. The trial court properly declined to make such a ruling and therefore disregarded Relators' general objections and reservation of the right to file later specific objections. The trial court did not abuse its discretion by ruling that Relators waived their objections (those unrelated to privilege) to Anderton's RFPs by failing to timely file them.

## CONCLUSION

We have held that the respondent trial court abused its discretion in (1) holding that Relators waived their claims of privilege and (2) granting Anderton's motions to overrule Relators' claims of privilege and compel discovery responses without conducting an in camera review. We also hold that appeal is an inadequate remedy to correct the trial court's error. *See In re Weekley Homes, L.P.*, 295 S.W.3d at 322; *In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d at 223*; Walker*, 827 S.W.2d at 843. Accordingly, we ***conditionally grant*** Relators' petition for writ of mandamus. We direct the trial court to vacate its September 12, 2012 order partially granting Anderton's motion to overrule Relators' claims of privilege and granting his motion to compel discovery responses, and to (2) conduct further proceedings consistent with this opinion. We trust that the trial court will promptly vacate its September 12, 2012 order in compliance with this opinion and order. The writ will issue only if it fails to do so ***within ten days of the date of this opinion and order***. The trial court shall furnish this court, within the time for compliance with this court's opinion and order, a certified copy of the order vacating its September 12, 2012 order. We lift our stay of proceedings ordered on September 24, 2012.[4]

---

[4] Because Relators' fourth and fifth issues are dispositive, we need not address their remaining issues. *See* TEX. R. APP. P. 47.1.

**JAMES T. WORTHEN**
Chief Justice


Opinion delivered August 15, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# <u>ORDER</u>

**AUGUST 15, 2013**

**NO. 12-12-00325-CV**

**IN RE PARK CITIES BANK, THOMAS YOUNGBLOOD,
MICHAEL MERRITT, JOHN DIENES, STEVEN METZGER,
BRIAN NEITZEL, TODD ASHBROOK, MICHAEL SAKS, AND
PCB SMITH COUNTY PROPERTIES, LLC,**
Relators
v.
**HON. RANDALL L. ROGERS**,
Respondent

## ORIGINAL PROCEEDING

ON THIS DAY came to be heard the petition for writ of mandamus filed by **PARK CITIES BANK, THOMAS YOUNGBLOOD, MICHAEL MERRITT, JOHN DIENES, STEVEN METZGER, BRIAN NEITZEL, TODD ASHBROOK, MICHAEL SAKS, AND PCB SMITH COUNTY PROPERTIES, LLC**, who are the relators in Cause No. 59,872-A, pending on the docket of the County Court at Law #2 of Smith County, Texas. Said petition for writ of mandamus having been filed herein on September 24, 2012, and the same having been duly considered, because it is the opinion of this Court that the petition is meritorious, it is therefore CONSIDERED, ADJUDGED and ORDERED that the said petition for writ of mandamus be, and the same is, hereby ***conditionally granted***.

And because it is further the opinion of this court that the trial judge will act promptly and vacate his order of September 12, 2012, partially granting the motion of **LEWIE C. ANDERTON** to overrule Relators' claims of privilege and granting his motion to compel discovery responses, the writ will not issue unless the Honorable Randall L. Rogers, Judge of the County Court at Law #2, fails to vacate the September 12, 212 order as directed by this order within ten (10) days from the date of this order.

It is further ORDERED that **LEWIE C. ANDERTON** pay all costs incurred by reason of this proceeding.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*